Filed 2/18/15  P. v. Ward CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ERIC WARD,<br><br>    Defendant and Appellant. | B251294<br><br>(Los Angeles County<br>Super. Ct. No. PA072834) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cynthia L. Ulfig, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Eric Ward of one count of attempted premeditated murder (Pen. Code,[1] §§ 664/187) and one count of assault with a deadly weapon (§ 245, subd. (a)(1)) in connection with the January 3, 2011, stabbing of Oscar Orosco. The jury also found true for both counts allegations that defendant personally used a deadly weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)). After the trial court found the prison priors (§ 667.5, subd. (b)) alleged against defendant to be true as well, it sentenced defendant to life without parole plus six years on the attempted murder count, related allegations, and prison priors. The court sentenced defendant to a midterm sentence of three years on the assault count, plus an additional four years for the enhancements. The latter sentence was stayed pursuant to section 654. Defendant has timely appealed on the sole ground that the court committed prejudicial error by declining to instruct the jury on self-defense. We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Evidence Adduced at Trial

On January 3, 2011, Oscar Orosco lived in a North Hills apartment with his girlfriend, Natalie Barragan, and their infant daughter. Orosco's parents and brother also lived in the apartment, which was located within a multi-building complex. Defendant lived in the same apartment complex, in a building across a courtyard from Orosco's. Defendant's roommates included his girlfriend, Marlena; his friend, Sean Gordon; and Gordon's girlfriend, Reina Patini.

Defendant and Orosco met one another at the apartment complex about six months to a year prior to January 3, 2011, and became friends. They frequently hung out  and

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

drank together and did not have any problems or "bad blood" between them. At one point in 2010, Orosco even stayed at defendant's apartment for a few days when he (Orosco) was having problems with his family.

Orosco's girlfriend, Barragan, did not like Orosco spending so much time hanging out and drinking with defendant. Barragan told Orosco she did not want him "kicking it" with defendant like he used to. She once slammed the door in defendant's face when he came by to visit Orosco. Defendant complained to Orosco that he did not get to "kick it" with Orosco as much after Barragan began living with him.

On January 3, 2011, the night of the incident, Orosco returned home from drinking with a friend and went behind the building to drink some more with defendant and defendant's roommate, Gordon. While the trio was outside drinking, four or five of Orosco's friends who used to live in the apartment complex stopped by and visited with Orosco. After Orosco's friends left, defendant started "tripping out" and asking who Orosco's friends were and why they had come. Defendant repeatedly accused Orosco of trying to "set him up." Defendant "didn't want to stop" making accusations even after Orosco explained that his friends were "regular friends that lived in the apartment" and were "not no gang bangers or nothing like that." Defendant persisted in his allegations, and Orosco "kept telling him over and over that it's not like that, that I wouldn't do that to him because he was my friend." Eventually Orosco became angry and defendant "looked really mad" as well.

Orosco returned to his apartment after the argument; by then it was about 11:00 p.m. Upon his return Barragan went to defendant's apartment to visit Patini. She and Patini went upstairs to Patini and Gordon's bedroom, where Gordon and defendant already were hanging out. According to Barragan, defendant was "basically screaming" that she and Orosco were trying to set him up. He was "just standing" in his striped collared shirt, gray thermal, and half-zipped black jacket, "shaking his hands like mad," and "saying it mad." He also looked at Barragan and said that he was "going to stab these motherfuckers in the back." Although defendant did not mention names and she

3

did not ask him for clarification, Barragan knew defendant was talking about her and Orosco because he was looking at her and had begun accusing her and Orosco of trying to "set him up" a couple of months earlier. He had never mentioned stabbing before, however.

Patini told defendant to leave and he decamped to his bedroom next door. Barragan told Patini she was scared and wanted to go home. As Patini walked her to the front door, Barragan heard what sounded like defendant "socking" the walls and throwing things in his room. Barragan estimated her visit lasted about five minutes.

When Barragan returned home, Orosco asked his father, Manuel Orosco ("Manuel"), for a cigarette and went outside to smoke. Orosco testified that he did not remember anything beyond that.

Gordon also was outside in the courtyard smoking a cigarette. He saw Orosco and the two began "shooting the breeze." Defendant showed up about five minutes later. Defendant walked over to Orosco and began talking with him. Gordon, who could not recall whether defendant looked upset, stepped back about five feet to give defendant and Orosco some privacy.

According to Gordon, there initially was "no animosity" between defendant and Orosco. They spoke quietly for about one to two minutes before their conversation turned heated. Gordon could not tell what they were saying, but he saw them standing about six inches apart and getting in each other's faces a little bit.

The verbal dispute turned physical when Orosco punched defendant in the face "with all his might." Defendant immediately responded in kind with a punch to Orosco's face, and then "[i]t was just back and forth punching, punching, punching, punching." As far as Gordon could tell, it was a fistfight; he did not see any type of weapon. Eventually, one of the men picked up the other and slammed him to the ground. Gordon thought defendant probably did the slamming, because he was bigger and heavier than Orosco, but he was not sure. Eventually defendant ended up on top of Orosco and the two continued "punching back and forth."

4

"[L]ike 10, 15 seconds" after defendant and Orosco hit the ground, Gordon noticed a lot of blood and stopped the fight by pulling defendant "off of" Orosco. Orosco's face was "really bloody" and there was a "pretty big" hole in his neck. Blood was "pumping out" of the neck wound, and "there was blood everywhere." Gordon yelled for help and ran to alert Orosco's parents. Gordon was not sure where defendant was, but remembered that he was not present when emergency responders arrived on the scene. Gordon remembered previously listening to an audio recording of himself telling detectives that defendant ran into his apartment and then left the scene.[2]

According to Manuel, he was eating dinner on January 3, 2011, when Barragan told him that Orosco was calling for him. Manuel also heard Orosco yelling for help. Manuel went to the courtyard and saw Orosco kneeling there. Manuel saw defendant standing either on top of Orosco or to his side, punching him with his hands. Manuel did not see anything in defendant's hands. Defendant ran away into his apartment building when Manuel approached. Manuel carried or assisted Orosco back to the family's apartment. He testified that Orosco was bleeding from "the neck, from his stomach, from his gut." Photographs of a blood trail in the hallway of Orosco's apartment building, a pool of blood on the doorstep, and a trail of blood leading into the apartment's kitchen were admitted into evidence.

Orosco continued to bleed after being accompanied into the apartment, so Manuel and Barragan carried Orosco back outside. Orosco collapsed on the way. Manuel ran to get his truck, which he then backed into the courtyard area. Before Manuel could do anything else, the police arrived and detained him and everyone else at the scene.

Barragan testified that about five minutes after Orosco went outside with his cigarette, she heard him yelling "Dad, help." Barragan told Manuel that Orosco was

---

[2]     It is unclear from the record when and under what circumstances Gordon reviewed the audio tape. The record reflects only that Gordon agreed that he listened to the tape and reviewed the transcript in the presence of Richard Quinones, the deputy district attorney currently prosecuting the case, and "another D.A. Nathan Bartos."

calling for him, and Manuel went outside. According to Barragan, Manuel ran back inside, told Barragan that Orosco had been stabbed, and called an ambulance. Barragan exited the apartment and saw Orosco walking down the hallway toward her. Blood was "jumping" from his neck into the air. Barragan asked him what happened and he said he didn't know.

Barragan helped Orosco into the apartment, towards the kitchen. Orosco fell to the floor and said he was not going to make it. He asked Manuel and Barragan to take him to the hospital. Manuel and Barragan tried to carry Orosco to Manuel's truck but Orosco collapsed near the end of the hallway. The police had arrived by that point, so Barragan went to look for the paramedics. She saw an ambulance "just standing in the middle of the street" and ran over to direct it to Orosco.

Barragan testified that the ambulance took Orosco to the hospital, where he remained in a coma for three weeks. The parties later stipulated that Orosco was in the hospital for eight days, from January 4, 2011, to January 12, 2011. Barragan testified that she visited Orosco in the hospital after he regained consciousness and asked him who had stabbed him. According to Barragan, he refused to tell her and said that he was not a snitch. He also said he did not remember who stabbed him.

When called by the defense, Orosco denied telling Barragan that he was not a snitch and maintained that he had no knowledge of who stabbed him – or of anything that happened after he went outside to smoke on January 3, 2011. He also said, however, that if he knew who stabbed him he would have identified the person because "that was my life right there."

Orosco did remember that when he woke up in the hospital, his head and stomach were hurting and he had big bandages on the right side of his neck and around his stomach. Orosco testified that he later had to have a total of approximately 20 surgical staples removed from wounds on his chin, the right side of his neck, his stomach, on his right side under his armpit just above his hip bone, and just above and on his buttocks. He did not have any of these wounds when he went out to smoke on January 3, 2011.

6

Officers from the Los Angeles Police Department found blood on defendant's bedroom door. Inside the bedroom, they found two garments that appeared to have blood on them: a striped collared shirt and a gray thermal or sweatshirt. They recovered a steak knife from defendant's closet.

The police sent samples from the two stained shirts to the lab for DNA analysis, along with some swabs containing blood from the courtyard. The stained shirts both contained blood from a single source profile that matched Orosco's DNA profile. Defendant's DNA profile also was included in other swab samples taken from the shirts. The blood from the courtyard matched Orosco's DNA profile.[3]

## B. Jury Instructions

The court held a jury instructions conference after both sides rested but prior to closing arguments. While reviewing CALCRIM No. 875 (Assault with Deadly Weapon or Force Likely to Produce Great Bodily Injury), the court noted the optional self-defense element and said, "[i]t also does not appear to the court there was any evidence of self-defense or defense of another." Defense counsel, who had not informed the court before resting that he wished to pursue a self-defense theory, argued that the jury should be instructed on the self-defense element of CALCRIM No. 875 because "the only testimony we have regarding the actual incident itself was that Mr. Orosco initiated whatever conflict there was by hitting Mr. Ward and then actions took place subsequent to that. So I think one [*sic*] certainly could be argued that this was self-defense." The prosecutor countered that "stabbing the victim multiple times went beyond self-defense. The testimony was that -- the testimony the victim did punch him, then the two began to fight and exchange blows, and then the victim was body-slammed -- or someone was, presumably the victim, according to Mr. Gordon. But then the act of stabbing him, which is what this charge is about, assault with a deadly weapon, went beyond any act of self-defense."

---

[3] The steak knife was not analyzed, even for fingerprints.

7

The court ruled: "The only testimony that was brought out was from Mr. Gordon saying that he observed Mr. Orosco strike the defendant once and then, basically, the fight was on. I don't think this rises to self-defense. It's not a case of Mr. Orosco being armed with any type of weapon or anything else, the action resulted in, basically, a fight. And if the jury believes the testimony, Mr. Ward brought a knife or some other cutting instrument to the fight, there is no evidence that Mr. Orosco had any type of weapon. [¶] So the self-defense portion, the court does not find there is adequate information to give element no. 5 with respect to instruction 875."

The court accordingly did not include the self-defense portion of CALCRIM No. 875 in its oral or written instructions to the jury. No other CALCRIM jury instructions pertaining to self-defense— namely Nos. 505 and 3470-3477—were discussed at the conference or given to the jury.

**DISCUSSION**

Defendant contends that the trial court erred in failing to instruct the jury on principles of self-defense. Specifically, he argues that the trial court should have given CALCRIM Nos. 505 (Justifiable Homicide: Self-Defense or Defense of Another) and 3470 (Right to Self-Defense or Defense of Another (Non-Homicide)), and should have included the contested self-defense element in CALCRIM No. 875 (Assault with Deadly Weapon or Force Likely to Produce Great Bodily Injury). We disagree.

The theory of self-defense offers a justification for acts that would otherwise be criminal. (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 67, p. 507.) The defense is available for both homicide and non-homicide crimes. (See § 197; § 693; CALCRIM No. 505 [Justifiable Homicide: Self-Defense or Defense of Another], CALCRIM No. 3470 [Right to Self-Defense or Defense of Another (Non-Homicide)].) "For self-defense, the defendant must actually and reasonably believe in the need to defend, the belief must be objectively reasonable, and the fear must be of imminent danger to life or great bodily injury." (*People v. Lee* (2005) 131 Cal.App.4th 1413,

8

1427; see CALCRIM Nos. 505 & 3470.) [4] The right of self-defense is limited to the use of such force as is reasonable under the circumstances. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.) Although the test for reasonableness is an objective one, "reasonableness is determined from the point of view of a reasonable person in the defendant's position." (*Ibid.*) Notably for our purposes, being assaulted with fists does not generally permit a person to respond with deadly force, unless the person reasonably believes that the assault is likely to inflict great bodily injury. (*People v. Enriquez* (1977) 19 Cal.3d 221, 228, disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn.3; 1 Witkin & Epstein, Cal. Criminal Law, *supra*, § 75, p. 517.)

It matters little for our purposes that defendant expressly requested only one of the instructions currently at issue. "It is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence [Citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [Citation]—unless the defense is inconsistent with the defendant's theory of the case [Citation]." (*People v. Salas* (2006) 37 Cal.4th 967, 982.) Similarly, "[a] trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury

---

[4]    In the context of homicide crimes, self-defense may be available even where a defendant acts unreasonably. "Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. [Citations.] A killing committed when that belief is *unreasonable* is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 134.) "Unreasonable self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter.' [Citation.] Whenever there is substantial evidence that the defendant killed in unreasonable self-defense, the trial court must instruct on this theory of manslaughter. [Citation.]." (*Ibid.*) Defendant does not contend that he acted in unreasonable self-defense or that the trial court should have instructed the jury on attempted voluntary manslaughter. We accordingly do not consider the impact, if any, of the absence of these instructions. (See *People v. Grimes* (2015) 60 Cal.4th 729, 757-758.)

consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) "'[U]nsupported theories should not be presented to the jury.'" (*Id.* at p. 40.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' [Citations.]" (*People v. Salas*, *supra*, 37 Cal.4th at p. 983.)

Here, there was no substantial evidence from which the jury could have concluded that defendant's repeated stabbing of Orosco was a reasonable or necessary response under the circumstances of the fistfight. Although Orosco initially swung at defendant's face "with all his might," defendant did not respond with deadly force to this powerful punch. (*Cf. In re Nirran W.* (1989) 207 Cal.App.3d 1157, 1161 ["The use of hands or fists alone may be sufficient to support a conviction of assault by means of force likely to produce great bodily injury."]) Instead, defendant responded in kind, and the two men fought for a period of time using only their fists. At some point, the fight moved to the ground, and defendant, whom Gordon testified was bigger and heavier than Orosco, was on top. Then, and only then, after he had the upper hand, did defendant stab Orosco; Gordon noticed blood "10, 15 seconds" after defendant and Orosco hit the ground.

There was no evidence that Orosco pulled, threatened defendant with, or even possessed a weapon, or that defendant (reasonably or unreasonably) expected him to do so at any time before or during the fight. Defendant's fists had been sufficient to keep Orosco at bay throughout the altercation, and there was no evidence from which the jury could have found that circumstances had changed such that weaponry or deadly force was required to fend off Orosco once he was on the ground beneath defendant. Defendant points out that Orosco continued to punch him "all the way through to the end of the fight," but we are not persuaded that this continued resistance – alone or in combination with the other relevant circumstances, such as Orosco's inebriation (see *People v. Villanueva* (2008) 169 Cal.App.4th 41, 52) and the parties' previous verbal argument – gives rise to an inference that defendant suddenly feared for his life or safety

10

such that he needed to escalate the fight. (See *People v. Minifie*, *supra*, 13 Cal.4th at p. 1068-1069 [noting importance of defendant's state of mind and perception of the victim's behavior at the time he wielded the force at issue].)

Even if the jury believed that Orosco and/or Barragan had been trying to "set up" defendant (see *People v. Minifie*, *supra*, 13 Cal.4th at p. 1069), there is no evidence supporting defendant's sudden escalation of the fight. "There must be evidence the defendant feared imminent, not just future" – or past – harm. (*Id.* at p. 1068.) That evidence simply was not present here.

Even if it had been, the absence of instructions on self-defense did not prejudice defendant, even assuming that the more stringent *Chapman* standard applies. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Salas*, *supra*, 37 Cal.4th at p. 984 [standard of prejudice for failure to instruct on affirmative defense not yet determined]; *People v. Watt* (2014) 229 Cal.App.4th 1215, 1219-1220 [same].) Under the *Chapman* standard, an error is harmless if the record establishes beyond a reasonable doubt that the error did not contribute to the jury's guilty verdict. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)[5] The record here meets this exacting standard.

The jury specifically found true the People's allegation that defendant attempted to murder Orosco "willfully, deliberately and with premeditation within the meaning of Penal Code Section 664(a)." Ample evidence supported this conclusion. Barragan testified that defendant, who had been accusing her and Orosco of trying to "set him up" for months, looked at her and angrily threatened to "stab these motherfuckers in the back" minutes before the incident. Orosco testified that he and defendant had argued about defendant's accusations earlier in the evening, and defendant "looked really mad" and would not listen to Orosco's assurances that no "set up" was in the works. After these incidents, defendant spent time in his room, where he stored at least one knife, and

---

[5] Under the less stringent *Watson* standard, a defendant is prejudiced if it is reasonably probable the verdict would have been more favorable to him absent the alleged error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

remained angry to the point of "socking" the wall and throwing things. Defendant armed himself with a deadly cutting instrument prior to seeking out Orosco for further conversation, and stabbed Orosco numerous times in response to punches from the smaller man.

Defense counsel did an admirable job of trying to discredit Barragan's crucial testimony on many of these points by arguing that Barragan was biased against defendant, impeaching her on several occasions, and getting Gordon to concede on cross-examination that he did not remember the alleged threats or loud noises coming from defendant's room. However, the verdict necessarily reflects that the jury instead credited Barragan's testimony and other uncontroverted evidence to find that defendant acted with malice during the premeditated attack. This finding distinguishes this case from *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1180, in which the failure to instruct on self-defense was prejudicial precisely because the jury acquitted defendant of first degree murder and "found appellant did not go to the alley with a willful, deliberate, and premeditated plan to kill his cousin." In light of the strong evidence presented and the jury's express finding of premeditation, we find no prejudice to defendant under any standard.

## DISPOSITION

The judgment of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

12